Michael C. Mormando, Esq.
(NJ Atty ID: 030352001)
ATTORNEYS HARTMAN, CHARTERED
68 East Main Street
Moorestown, NJ  08057
(856) 235-0220; (856) 273-8617
Our File No.T0584.00
Attorneys for Plaintiff

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **Benjamin Patti**<br><br>     Plaintiff,<br><br>v.<br><br>**Camden County Police Department, Individually and in their official capacity, Chief Gabriel Rodriguez, Assistant Chief Alexsandro Ibarrondo, Deputy Chief Janell Simpson, Deputy Chief Michael Shomo, Captain Anthony Moffa,  Captain Kevin Lutz, Lieutenant Curtis May, Lieutenant Victor Diaz, individually and in their official capacity.**<br><br>     Defendants. | CIVIL ACTION NO.<br><br><br><br><br><br><br>**COMPLAINT<br>AND<br>DEMAND FOR JURY TRIAL** |

## <u>COMPLAINT</u>

Plaintiff, Benjamin Patti, (hereinafter "Plaintiff"), an adult individual whose

permanent residence is 109 Pearlcroft Road, Cherry Hill, NJ 08034, County of Camden,

State of New Jersey, by way of complaint against the defendant makes the following

averments:

1. This is a civil action brought pursuant to the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §4301-4335 ("USERRA").

## JURISDICTION AND VENUE

2. The Court has subject matter jurisdiction pursuant to 28 U.S.C. 1331, and 38 U.S.C. §4323(b), *The Uniformed Services Employment and Reemployment Rights Act of 1994*, 38 U.S.C. §4301-4335 ("USERRA").

3. Plaintiff also invokes the pendent jurisdiction of this Court pursuant to 28 U.S.C. §1367 to consider claims arising under State Law as each such claim arises out of the same nucleus of operative facts as those that give rise to plaintiff's Federal claims, including but not limited to violations of the *New Jersey Law Against Discrimination* (LAD) (N.J.S.A. 10:5-1 et seq.).

4. Venue is proper in this judicial district under 38 U.S.C. §4323(c), and 28 U.S.C. §1391(b); Defendants Camden County (hereinafter "Camden County" or "the County") and Camden County Police Department (hereinafter "Camden Metro" or "Metro"), are located in Camden County, New Jersey, which is located in this judicial district, and a substantial part of the events giving rise to this suit occurred in this judicial district; the remaining Defendants, Chief Gabriel Rodriguez, Assistant Chief Alexsandro Iberrando, Deputy Chief Janell Simpson, Deputy Chief Michael Shomo, Captain Anthony Moffa, Captain Kevin Lutz, Lieutenant Curtis May, and Lieutenant Victor Diaz are current or former employees of Defendants Camden County Police Department, and acted in their official or individual capacity.

**PARTIES**

5. Plaintiff's permanent residence is 109 Pearlcroft Road, Cherry Hill, NJ 08034, Camden County, State of New Jersey

6. At all times relevant hereto, Plaintiff Benjamin Patti was a member of the New Jersey Army National Guard, with the current rank of First Sergeant having re-enlisted in the military in or about December 2, 2012.

7. At all times relevant hereto Plaintiff, was an "employee" (as defined in 38 U.S.C. §4303(3)) of Defendants Camden County and Camden County Police Department and was supervised by Chief Gabriel Rodriguez and Assistant Chief Alexsandro Ibarrondo, from approximately March 25, 2013, to present, and was supervised by Deputy Chief Michael Shomo from approximately 2020 to present, and was subject to the Internal Affairs process by the above named defendants and/or Deputy Chief Janell Simpson, Lieutenant Curtis May, and Lieutenant Victor Diaz, and was continuously harassed by same.

8. At all relevant times Plaintiff performed his work in a competent and efficient manner.

9. At all times relevant hereto, Defendants Camden County was a New Jersey Government "employer" (as defined in 38 U.S.C. §4303(4)(A)), with its principal place of business at 520 Market Street, Camden, New Jersey.

10. At all times relevant hereto, Defendants Camden County Police Department were a New Jersey Government "employer" (as defined in U.S.C. 38 §4303(4)(A)), with its principal place of business at 800 Federal Street, Camden, New Jersey.

11. At all times relevant hereto, Defendants Chief Gabriel Rodriguez, Assistant Chief Alexsandro Ibarrondo, Deputy Chief Janell Simpson, and Deputy Chief Michael Shomo, Captain Anthony Moffa, and Captain Kevin Lutz, as the supervision and leadership staff of Camden Metro, acted in their official capacity, and in their individual capacity.

12. At all times relevant hereto, Defendants Lieutenant Curtis May, and Lieutenant Victor Diaz, worked in the internal affairs department and acted in their official and individual capacity.

## FACTUAL BACKGROUND

13. Plaintiff incorporates the foregoing paragraphs of this complaint as if fully set forth herein.

14. Defendants have repeatedly discriminated against Plaintiff due to his service in the New Jersey Army National Guard, which is a segment of the United States military.

### Plaintiff's Military Service

15. Plaintiff first enlisted in the New Jersey Army National Guard on March 25, 1996.

16. Plaintiff served our country on active duty in the United States Army beginning on May 3, 1998, and was deployed to Macedonia and Kosovo from May of 2000 to December of 2000.

17. Plaintiff further served our country on active duty when he was deployed to Kuwait and Iraq during *Operation Iraqi Freedom* from September of 2002 to September of 2003.

18. Plaintiff received an honorable discharge from the Army as a Sergeant First Class on May 31, 2010, but would later rejoin the military in a subsequent year as described below.

19. In the meantime, Plaintiff started working as a dispatcher for Camden County on or about June 6, 2010, and continued in that position until on or about April 14, 2012.

20. In May of 2011, Plaintiff took the Civil Service Test for both Police and Fire.

21. Plaintiff was hired by the Camden County Sheriff's Department as a Sherriff's Officer on April 15, 2012.

22. Plaintiff attended the Police Academy from July 26, 2012, to December 14, 2012, and successfully graduated.

**Plaintiff's Re-enlistment in the New Jersey Army National Guard.**

23. On or about December 2, 2012, Plaintiff re-enlisted in the New Jersey Army National Guard.

24. On or about March 15, 2013, Plaintiff applied for a Patrol Officer position with Camden County "Metro" Police Department.

25. On or about March 21, 2013, Plaintiff received a conditional letter of employment with Camden Metro for the position of Patrol Officer.

26. On or about March 25, 2013, Plaintiff began working as a Patrol Officer for Camden Metro Police Department and continued working in that position until January 21, 2016, when Plaintiff was promoted to Acting Sergeant.

27. On or about February 11, 2016, Plaintiff took the Civil Service Test for the position of Sergeant.

28. Plaintiff received the fourth highest score on the Civil Service Test for the position of Sergeant.

29. On or about <u>December 18, 2016</u>, Plaintiff was promoted to the position of full-time Sergeant for Camden Metro Police Department.

30. In or about <u>October of 2018</u>, Plaintiff took the Civil Service Test for the position of Lieutenant.

31. Plaintiff received the twelfth highest score on the Civil Service Test for the position of Lieutenant.

32. From <u>October 15, 2019</u>, to <u>September 30, 2020</u>, Plaintiff served on military Orders with the New Jersey Army National Guard.

**<u>Quid Pro Quo Discrimination and Delayed Promotion</u>**

33. In <u>March of 2020</u>, during a time when Plaintiff was serving on military Orders, Plaintiff received a phone call from Camden Metro Captain Anthony Moffa ("Capt. Moffa").

34.  Capt. Moffa is presently retired from the Camden Metro Police Department.

35. During the March 2020 phone call, Captain Moffa, on behalf of Camden Metro, offered a quid-pro-quo and asked Plaintiff whether he would come back from military Orders early if Camden Metro gave him a promotion to the rank of Lieutenant.

36. Plaintiff responded to Capt. Moffa that he could not leave military Orders early and he had no control over changing his military Orders.

37. Plaintiff could not and did not comply with the Police Administration request to leave military Orders early in exchange for a promotion.

38.  Police Administration delayed Plaintiff's promotion to Lieutenant for three (3) more months, until June 1, 2020, when Plaintiff was finally promoted.

39.  Plaintiff's promotion to Lieutenant should have occurred in March of 2019, as there were openings in the department.

40.  Plaintiff's promotion to Lieutenant was intentionally delayed because Plaintiff refused Camden Metro's quid pro quo behest that he leave his military Orders early.

**Shooting Incident and Poor Treatment by Defendants**

41.  On May 9, 2021, an incident occurred outside Plaintiff's home at approximately 3:10 A.M., in which a vehicle drove past his home and an occupant of the vehicle fired a gun at Plaintiff's house while screaming "*F--- you*".

42.  The incident was captured on video by Plaintiff's neighbor's "Ring Camera".

43.  Plaintiff was asleep in his home as were his children at the time of the shooting.

44.  Police were notified and an investigation was opened by the Camden County Prosecutors Office and the Cherry Hill Police Department.

45.  During the investigation, Plaintiff and his wife were required to provide taped statements to assist the investigation.

46.  Plaintiff contacted Capt. James, Plaintiff's supervisor at the Camden Metro Police Department,  and told him about the shooting and further advised him that he would be unable to work his shift because the investigation was still underway, and he was required to provide a statement to the Cherry Hill Police Department about the shooting.

47. Capt. James advised Plaintiff that he spoke to Camden Metro Police Administration, and that Administration was requiring that Plaintiff use a vacation day to cover the missed time.

48. On the day of the shooting, Deputy Chief Verticelli called Plaintiff to ask him if the shooting really happened and to tell Plaintiff to update Capt. James; Verticelli did not ask if everyone was ok and no one else from Camden Metro Police Administration contacted Plaintiff following the shooting to check-in on Plaintiff or his family.

49. It was not until three weeks later, when Chief Gabriel Rodriguez finally contacted Plaintiff and asked how he was doing.

**Assignment to Night Shift as Discrimination and Retaliation**

50. On or about <u>September 27, 2021,</u> Plaintiff received military Orders to report to full-time duty with the New Jersey Army National Guard Duty as the State Marksman Coordinator, beginning on <u>October 1, 2021,</u> and continuing until <u>December 31, 2021</u>.

51. At the time those military Orders were received, Plaintiff's Camden Metro position was Lieutenant in charge of running the *Real Time Tactical Operations Information Center* ( hereinafter: "RTTOIC").

52. As Lieutenant of RTTOIC, Plaintiff was scheduled for night shifts from 6:00 P.M. to 6:00 A.M. even though there was the equivalent day-shift for RTTOIC, and notwithstanding the fact that Plaintiff was the most senior Lieutenant in RTTOIC (typically the more senior Lieutenant is allowed to choose the day shift).

53. After receiving military Orders concerning the October to December 2021 time frame, Plaintiff immediately notified Camden Metro that he would be required to be on military Orders from October 1, 2021, to December 31, 2021.

54. Prior to Plaintiff commencing those military Orders, Defendants then discriminated and/or retaliated against Plaintiff by assigning Plaintiff to night shifts notwithstanding that Plaintiff was the most senior Lieutenant in the RTTOIC.

55. Plaintiff's comparators at the time, who were not in the military, included Lt. Manthey, Lt. Henderson, and Lt. Reese;  those comparator Lieutenants were each promoted long after Plaintiff, and yet had received the preferred day-shifts in comparison to Plaintiff being assigned to work the night-shifts.

56. Prior to Plaintiff's departure for orders on October 1, 2021, Plaintiff's direct supervisor, Capt. Kevin Lutz, made a discriminatory remark to Plaintiff that "*__your time out on [military] Orders with the Army is causing you problems__*."

57. Plaintiff took a Civil Service Test for the position of Captain in or about  October of 2021.

58. Plaintiff's military Orders  for that time period concluded on December 31, 2021, however, Plaintiff came back to Camden Metro, early, on December 30, 2021, to prevent other current Lieutenant's from having to work a holiday weekend.

**Plaintiff was Unreasonably Denied a Shift-Switch**

59. On February 9, 2022, Plaintiff met with and verbally requested to Capt. Kevin Lutz asking to adjust his hours from the (6:00 P.M. - 6:00 A.M. shift) to the (12:00 P.M. - 12:00 A.M. shift), because Plaintiff was scheduled to report to Military Drill weekend

on February 12, 2022, a date which had been provided to Defendants approximately six-months prior.

60. Capt. Lutz discriminated against Plaintiff due to his military service by denying Plaintiff's request to adjust his hours by stating: "**_No, I can't do that, the military is just too much._**"

61. Capt. Lutz further discriminated against Plaintiff for his military service when Cpt. Lutz then stated to Plaintiff that he needed to use six hours of his personal time, rather than granting the shift switch.

**Discrimination by Unreasonable Denial of Vacation Day**

62. On <u>March 10, 2022</u>, Plaintiff texted Captain Shomo asking if he could take a vacation day on <u>March 11, 2022</u>.

63. At that time, there were three  Lieutenants scheduled to work the night of March 11, 2022, and coverage was available to cover Plaintiff's absence.

64. To Plaintiff's request for a vacation day, Capt. Shomo responded, "*Sorry can't approve*" without providing any reason to support the denial of the vacation day request.

**Notification Text Message Incident and Pretextual Investigation**

65. On <u>March 13, 2022</u>, while on duty and working in the RTTOIC, an incident occurred which required a notification text message to be sent to the Captains, Lieutenants, and select Sergeants on three separate text message threads.

66. The notification text message is typically sent out to the various recipients by the RTTOIC Analyst, Alex Eastlack, a civilian employee, after Plaintiff's approval of the message contents.

67. On <u>March 13, 2022</u>, mere minutes after the underlying incident occurred, Plaintiff received a text message from Capt. Shomo asking: "*What is this?*"

68. As it turns out, the Analyst (Eastlack) had failed to send the notification text message to Capt. Shomo's text thread, but he had sent the notification text to message to the threads of the other required individuals; i.e., Eastlack forgot to send the message to Capt. Shomo.

69. However, at the time that Capt. Shomo sent his own text message to Plaintiff inquiring "*What is this?*", Plaintiff had not been aware that the Analyst had failed to send the notification text message to Capt. Shomo's text thread.

70. Plaintiff, believing that Capt. Shomo must have been inquiring about the notification text message sent by the Analyst responded to Capt. Shomo by simply stating that it is the required notification that is always sent when an incident occurs.

71. Capt. Shomo responded that he never received the notification text message about the incident to his text thread but rather was made aware of it by another person.

72. Captain Shomo, looking to harass and vilify Plaintiff in any way he could, then admonished Plaintiff by claiming that Plaintiff's response to his question was "*inappropriate*".

73. Plaintiff followed-up and had a phone conversation with Captain Shomo clarifying what events had transpired, explaining that Plaintiff did not know Shomo had not been sent the text message, and explaining that Plaintiff's response text to Shomo was not meant to be disrespectful but rather there clearly had been a miscommunication that occurred.

74. Captain Shomo advised Plaintiff that he understood that there was a miscommunication and the situation appeared to be resolved; Shomo, however, would later harass Plaintiff concerning this situation by instituting a pretextual internal affairs investigation and discipline of Plaintiff, all concerning Shomo not receiving a text message from a separate civilian employee who seemed to inadvertently neglect to send a text message to Shomo.

75. On March 16, 2022, while on duty working the RTTOIC, Plaintiff was ordered by then Sgt. Curtis May (now a Lieutenant) to go to the Internal Affairs unit regarding Plaintiff's response text message sent to Capt. Shomo, and, for the failure of the civilian RTTOIC Analyst to send the required notification text message in the first place.

76. Specifically, notwithstanding the follow-up conversation that had taken place between Plaintiff and Capt. Shomo, it was now being alleged by Capt. Shomo, pretextually and baselessly, that Plaintiff failed to advise the Analyst exactly who was supposed to receive the notification text message alert.

77. Capt. Shomo's allegation was patently and knowingly false.

78. Plaintiff was harassed by being forced to submit to an interview with internal affairs, as a result of Capt. Shomo's baseless and pretextual allegations, that were in reality a form of continued discrimination against Plaintiff for his military service.

79. Then, on May 3, 2022, while on duty in the RTTOIC, Plaintiff was again harassed when he was again called back into Internal Affairs for further questioning regarding the notification text message incident.

80. To further illustrate just how harassing defendants were to Plaintiff: at the time of the May 3, 2022, Internal affairs interview, Plaintiff was further harassed by then Sgt. Curtis May (now a Lieutenant) and the Internal Affairs Department, at the direction of Deputy Chief Ibarrondo, when Plaintiff was asked about an entirely different situation that he was never put on notice pursuant to Internal Affairs guidelines: namely, Plaintiff was ordered by Sgt. Curtis May to account for how much of Plaintiff's on-duty time at Camden Metro was spent walking outside to have a cigarette.

81. Sgt. Curtis May advised Plaintiff that they had been reviewing the camera footage from the inside of the police administration building for the two-weeks prior, and claimed that they counted the amount of time Plaintiff spent on breaks and tallied that time at approximately 53 minutes per twelve hour shift which equates to a 3 or 4 minute break per hour.

82. Historically, Plaintiff has not been provided with breaks and often can't even get a lunch break due to the workload, and yet the Internal Affairs Department had conducted a 'fishing expedition' investigation into smoke breaks of Plaintiff, even though they never notified him of such investigation which is a violation of Internal Affairs policy.

83. Indeed, based upon information and belief, Det. Sullivan was made to spend three (3) full days to review camera footage of Plaintiff coming and going in order to document what Plaintiff was doing in his shift.

84. After the Internal Affairs interview Plaintiff asked Sgt. Curtis May when this would all end and highlighted that he's done nothing wrong; in response, Sgt Curtis May said he was only doing what he was told and said he didn't know why this was happening and further said: "*you're one of the hardest working guys*" (referring to Plaintiff).

85. Thus, Sgt. Curtis May engaged in an internal affairs investigation of Plaintiff even though by his own admission he stated he didn't know why it was happening.

**New Procedure for Time-Off Requests Utilized to Discriminate Against Plaintiff**

86. On May 3, 2022, Captain Shomo sent out an email regarding a new procedure for submitting time-off requests, which was to be submitted through the "Leave" App / Electronic Calendar.

87. Captain Shomo further stated that coverage must be found prior to the time-off request being submitted.

88. Prior to the policy change, Plaintiff had properly submitted three separate requests for time off, for May 25, May 26, and June 22, of 2022, and he had previously received approval as to each day he requested.

89. However, after Captain Shomo sent out the email regarding the new procedure  for submission and approval of time-off, Capt. Shomo continued his harassment of Plaintiff by causing Plaintiff's previously approved time-off to be rescinded.

90. Showing disparity, and based upon information and belief, at least one or two other Lieutenants were permitted to take time off during that same time period.

91. Also, on <u>May 3, 2022</u>, Civil Service published the test results, and Plaintiff received the third highest score on the Captain's examination.

**Pretextual Discipline**

92. On <u>May 4, 2022</u>, defendants continued to harass Plaintiff with a pre-textual discipline: Specifically, Plaintiff was issued a discipline in the form of a monetary fine equivalent to 8-hours of on-duty pay.

93. The discipline, which was pre-textual and harassing, was issued against Plaintiff for allegedly walking through the hallways of the police administration building with an unlit cigarette in his mouth and also for alleged "Failure to adhere to work expectations" claiming that Plaintiff failed to properly instruct the civilian analyst to send the notification text messages to Captain Shomo's text thread (even though the Analyst had been aware of the requirement and had done it on every prior incident that had occurred on the night in question, and every incident on previous shifts).

94. The discipline issued against plaintiff was baseless, discriminatory, retaliatory, and pre-textual.

**Overheard Conversations Demonstrating Discrimination and Retaliation**

95. On <u>June 3, 2022</u>, Plaintiff was contacted by Sergeant Nicholas Rao ("Rao"); Rao advised Plaintiff that several people were present and overhead a speakerphone conversation between Camden County Metro Police Department Human Resources Supervisor, Anthony Bucchi ("Bucchi"), and an unidentified member of the Camden County Human Resources Department.

96. Rao explained that multiple people overhead the unidentified member of the Camden County Human Resources Department state to Bucchi: "*Who is this Ben Patti guy? They really don't like him and don't want to promote him at all.*"

97. This overheard comment demonstrates the culture of discrimination and retaliation that existed as against Plaintiff by both Defendants Camden Metro Police Department and Defendants Camden County.

**Initial Refusal to Allow Plaintiff to Obtain Shift Coverage**

98. On June 5, 2022, Plaintiff spoke with Lt. Manthey, requesting that Manthey cover a portion of Plaintiffs shift, from (4:00 A.M. to 6:00 A.M.), so that Plaintiff could attend his son's Army Enlistment Ceremony at Fort Dix.

99. Lt. Manthey agreed to cover Plaintiffs (4:00A.M. to 6:00 A.M.) portion of the shift.

100. Plaintiff then sent a text message to Captain Shomo asking permission to leave at 4:00 A.M. so that he could attend his son's Army Enlistment Ceremony, and spend time with his son before his son left the following day for Fort Sill in Oklahoma, where Plaintiff's son would be stationed for the next three years.

101. Plaintiff further advised Captain Shomo through text message that, per Camden Metro Policy, Plaintiff had already found coverage (Lt. Manthey) for the (4:00A.M. to 6:00A.M.) portion of the shift.

102. Captain Shomo, through text message response denied Plaintiff's request, claiming that "*he could not approve overtime for coverage.*"

103. Plaintiff then called Captain Shomo, and spoke with him regarding the request to see his son off from Fort Dix.

104. Plaintiff explained that because there were no other Lieutenants on night shift, it was impossible for Plaintiff to switch a shift with anyone or request a day off without approval for overtime.

105. Plaintiff also explained to Captain Shomo that he had previously requested to take off on this day, but that was denied by Shomo.

106. Plaintiff also explained to Captain Shomo that other Lieutenants had been allowed to take off during the same time periods when Plaintiff was denied.

107. Following their conversation, Captain Shomo begrudgingly reversed his decision and approved Plaintiff's time-off to see his son.

**Promotions in May 2022, Disparate Treatment, Discrimination and Retaliation**

108. On or about May 4, 2022, Plaintiff observed that the Civil Service Captain's promotional examination list was posted and showed the test rankings as follows: 1) Lt. William Martin; 2) Lt. Edward Kunkel; 3) Lt. Benjamin Patti (Plaintiff); 4) Lt. Christopher Sarlo; 5) Lt. and Acting Captain Michael Shomo; 6) Lt. Janell Simpson (now Deputy Chief Simpson); 7) Lt. Michael Ross; 8) Lt. Brandon Kersey; 9) Lt. Thomas Collins; and 10) Lt. Richard Burns.

109. On June 8, 2022, all personnel who were on the Civil Service Captains List were ordered to go into work and told to report to the Camden Metro Chief's Wing at 1400 hours for a meeting with the Chief (Gabriel Rodriguez).

110. Present in the meeting were, Plaintiff, Lt. Shomo (Acting Captain), Lt. Sarlo, Lt.. Ross, Lt. Kunkel, Lt. Burns, Lt. and Acting Captain Kersey, and Lt. and Acting Captain Janell Simpson and Chief Gabriel Rodriguez.

111. Plaintiff was advised in this meeting that was being promoted to Captain.

112. The other meeting participants were also advised as to their relative promotions.

113. During that meeting, the attendees were further advised that the next three weeks would be used to help them transition into their new positions.

114. Also at the meeting, Plaintiff was told that he would be assigned as the Operations Captain for "*Day A*", but disparate from the other promotes, Plaintiff would <u>not</u> be transitioning from his previous role as the Lieutenant of the RTTOIC, meaning that Plaintiff would have to perform both roles.

115. In fact, Plaintiff was the only person in that meeting who was not being transitioned to his new role the way the others were transitioning.

116. Additionally, Plaintiff was told he would remain on night shifts (the 6:00 P.M. to 6:00 A.M shift), where he was expected to fulfill his previous duties as a Lieutenant, but also would be required to fulfill his new duties as the Operations Captain during the day time.

117. Specifically, Plaintiff was advised that in addition to the Lieutenant duties he was responsible to perform, Plaintiff was responsible for the following Captain duties:

    A)    Sending out all Command level notification texts for the 24-hour period Plaintiff was working;

    B)    Attend the 9:00 A.M. conference phone call for the daily Chief's update briefing;

    C)    Attend the 9:30 A.M. conference call for the daily Deputy Chief's meeting;

D)      Perform a Captain's roll call via zoom or in person daily at 6:00 A.M., 7:00 A.M., and 10:00 A.M.;

E)      On Wednesdays at 2:00 P.M., report into work for the weekly TRAC meeting.

118. The above-mentioned duties that were assigned to Plaintiff during the June 8, 2022, meeting directly conflicted with the shift hours Plaintiff was forced to work, namely the night shift: (6:00 P.M. to 6:00 A.M).

119. The intentionally created schedule conflict demonstrates the extreme harassment of Plaintiff as it allowed Plaintiff no more than three hours of sleep each day, if that.

120. Also on or about June 9, 2022, Plaintiff was further advised by then Acting Deputy Chief Shomo that that he would be the <u>only</u> Captain that would be assigned to night shifts during the transition process.

121. As a point of comparison, in the June 8, 2022, meeting, Capt. Ross was assigned as the Operations Captain for "*Day B*" and was advised that he would be immediately transitioning into his position and would be expected to work from 12:00 P.M. to 12:00 A.M., and was <u>not</u> expected to fulfill any of his previous duties.

**Plaintiff was Assigned the Oldest Vehicle in the Fleet as Further Discrimination**

122. During the June 8, 2022, meeting, all Captains were further advised to make arrangements to obtain "a take home vehicle" being assigned to them.

123. After the meeting, Plaintiff sent an e-mail to the vehicle Fleet Manager in reference to "getting a take home vehicle" assigned to him.

124. Shortly after sending the email, Plaintiff received a call from Deputy Chief Shomo, who admonished Plaintiff by stating that "*you had no right to contact the Fleet Manager,*" and Chief Shomo further commanded that he (meaning Shomo) would assign a vehicle to Plaintiff.

125. Plaintiff was the last person to be assigned a vehicle.

126. The vehicle assigned to Plaintiff was the oldest vehicle in the fleet.

**Plaintiff Contacted Human Resources Department About the Overheard Conversations**

127. On June 15, 2022, Plaintiff contacted Camden Metro Police Department Human Resources Supervisor Anthony Bucchi (who is the liaison between Camden Metro Police Department and Camden County Human Resources), and asked him about the overheard conversation that took place on June 3, 2022, referenced above in this complaint (see paragraphs no. 95-97, above).

128. Bucchi divulged to Plaintiff that the Police Administration had been looking into any possible way to skip Plaintiff in the promotional process (notwithstanding Plaintiff's rank as #3 on the Civil Service Exam for Captains and his veteran's status).

129. Bucchi further divulged to Plaintiff that Assistant Chief Ibarrando stopped all communications with Bucchi regarding promotions and started communicating with the Camden County Resources Department directly, which circumvented Bucci's involvement as Camden Metro Human Resources.

130. Bucci further explained that this was the first time since he had worked in his position that he was kept out of the promotional process and the first time that someone in the

police administration went directly to Camden County Human Resources Department rather than the Camden Metro Police Department Human Resources.

**Plaintiff Forced to Work on a Vacation Day**

131. On  June 22, 2022, Plaintiff was off from work on a pre-approved vacation day; however, Plaintiff was made to report to work for a mandatory TRAC meeting which was scheduled at 2:00 P.M. that day.

132. During the June 22, 2022, TRAC meeting, Deputy Chief Shomo ordered Plaintiff, along with Lt. Randall, Sgt. Graf, and Sgt. Reed to stand up in front of all the attendees.

133. Deputy Chief Shomo proceeded to shout and verbally berate Plaintiff, Randall, Graff and Reed, about a separate officer who was allegedly late for roll call and for another minor uniform violation observed during roll call.

**Harassment by Ordering Plaintiff to Provide Duplicative Reports**

134. Following the June 22, 2022, TRAC meeting, Deputy Chief Shomo asked Plaintiff: "*why [Plaintiff] hadn't sent out all the required text messages to the command staff notifying them about any incidents that occurred.*"

135. Plaintiff advised Deputy Chief Shomo that he had, in fact, sent out all notifications that he had received.

136. Deputy Chief Shomo advised Plaintiff that he had failed to send out one (1) text message that was sent to him.

137. Plaintiff, who had received and sent out multiple text messages on that day, checked his phone log, searching for the alleged text message that Deputy Chief Shomo referenced, however, no such message existed on Plaintiff's phone.

138. Plaintiff then reviewed the RTTOIC phone and confirmed that Plaintiff was listed on the text message log, which purported to indicate that the message was sent to Plaintiff; still, Plaintiff did not have that message in his own phone.

139. Deputy Chief Shomo, in his continued harassing fashion, then ordered Plaintiff to write a "detailed" timeline of every text message Plaintiff received and every incident that day, including times, officers present, and a brief account of what occurred during the incident.

140. The detailed information now ordered by Deputy Chief Shomo, had already been repeatedly provided to Shomo in the _End of Tour Report_ and the _Sit Rep Report_ as well as numerous other forms of documentation; thus, Shomo's order of Plaintiff demonstrated Shomo's intention was merely to harass Plaintiff.

141. Plaintiff completed the additionally ordered report and submitted it to Deputy Chief Shomo on June 22, 2022.

**Plaintiff was Again Ordered into Work on a Day Off as a Continuation of Harassment**

142. On June 24, 2022, Deputy Chief Shomo ordered Plaintiff into work on Plaintiff's day off for the purpose of making a correction to the duplicative report submitted on June 22, 2022, regarding the text message Plaintiff never received and the detailed timeline Deputy Chief Shomo ordered.

143. To clarify, Deputy Chief Shomo ordered Plaintiff to write an unnecessary, duplicative report, and then made Plaintiff come to work on his day off to make a correction to that unnecessary report, all to continue his harassment of Plaintiff for daring to serve in the military.

**Plaintiff was Excluded from an Operations Meeting**

144. On July 1, 2022, while Plaintiff was on duty as an Operations Captain, Plaintiff received a phone call from Sgt. Berg, asking about "the new transfers".

145. Plaintiff advised Sgt. Berg that Plaintiff was working and that he had not been notified about any transfers.

146. Capt. Sarlo then advised Plaintiff that there had been a meeting earlier on July 1, 2022, with Deputy Chief Shomo, Capt. Kunkel, and Capt. Sarlo, regarding the department officially getting rid of the mid-shift and as to where those officers would then be assigned.

147. Plaintiff was at work and on duty at the time of that meeting, and, as an Operations Captain, should have been notified and included in the meeting mentioned.

148. Yet, Plaintiff was not notified of the meeting and was not included in the meeting.

149. Plaintiff went to  Deputy Chief Shomo's office and asked Deputy Chief Shomo about the meeting, the transfers, and why Plaintiff was not asked to be in the meeting since it was clearly an Operations matter.

150. Deputy Chief Shomo told Plaintiff that "*he didn't want too many hands in the pot*" and that Plaintiff "*shouldn't get upset, its not that big a deal.*"

151. Deputy Chief Shomo then proceeded to tell Plaintiff that he needed to be "*Dialed in 24/7, 365 days a year*".

**Continued Evidence of Discriminatory Bias Held Against Plaintiff**

152. On <u>July 3, 2022</u>, Plaintiff was on duty as Operations Captain, and received a text message from Deputy Chief Shomo, asking "*what things are looking like on the streets of the city.*"

153. On that day, Plaintiff had been out monitoring and checking all posts and areas for the previous several hours and had personally monitored the conditions of the city.

154. Plaintiff responded to the text message from Deputy Chief Shomo and provided him with the details he requested.

155. Deputy Chief Shomo immediately called Plaintiff and advised that "*next time*" Plaintiff should wait, and not reply so quickly, as it "*appears that I just made things up.*"

156. Plaintiff responded to Deputy Chief Shomo's absurd statement by explaining that Plaintiff had been out working and monitoring the streets for hours and had personally conducted the necessary checks that were the basis of his response.

157. Deputy Chief Shomo advised Plaintiff that he was aware of the fact that Plaintiff had personally observed the city, but then claimed that that Plaintiff's fast response caused Assistant Chief Ibarrondo to "*question [Plaintiff's] ability*".

158. As a result of the conversation between Deputy Chief Shomo and Plaintiff, it was clear to Plaintiff that now he was even being harassed for doing his job well (i.e. doing his job "so quickly"), all as a result of the continued bias against him for serving in the military.

**Chief Rodriguez Hung-Up the Phone on Plaintiff**

159. On July 7th to July 8th, 2022, Plaintiff worked the 2:00 P.M. – 2:00 A.M. shift and then went off-duty.

160. However, Plaintiff was made to attend a "mandatory" phone meeting hours later at 9:00 A.M. on July 8, 2022, with Chief Rodriguez, Deputy Chief Shomo, Capt. Ross, Capt. Sarlo, Capt. Kunkel, and Capt. Kersey.

161. During the 9:00 A.M. meeting on July 8, 2022, Plaintiff gave a detailed report on staffing issues, training for officers, issues that came up during the shift (including a homicide that had occurred that evening), and all significant events that had occurred the night previous while Plaintiff had been working.

162. After Plaintiff gave the Report, Chief Rodriguez asked Plaintiff, "*where did we drop the ball last night?*"

163. Plaintiff understood that Chief Rodriguez's question was likely specific to the homicide that had occurred the previous night.

164. However, since Plaintiff had just provided detailed information regarding the homicide during his report,  he asked Chief Rodriguez for clarification as to his question.

165. Chief Rodriguez responded by hanging up the phone.

**Plaintiff was Ordered into Work, Again, on a Day-Off, as Continued Harassment**

166. After the 9:00 A.M. Phone call on July 8, 2022,  Shomo ordered Plaintiff and all Captains into work.

167. Deputy Chief Shomo ordered Plaintiff, Capt. Ross, Capt. Sarlo, Capt. Kunkel, and Kapt. Kersey into an in-person meeting.

168. During this meeting, the participants were again made to go through the details of the homicide that had occurred the night prior.

**Plaintiff was Ostracized and Harassed, Again**

169. Once the details of the homicide were again discussed, all other Captains were dismissed from the meeting except for Plaintiff.

170. Deputy Chief Shomo continued his harassment of Plaintiff when he then ordered Plaintiff to complete an "Information Report" on "why [Plaintiff] asked Chief Rodriguez a question" referring to Plaintiff's having asked Chief Rodriguez for clarification during the earlier phone call.

171. Deputy Chief Shomo further ordered that Plaintiff write yet another report detailing all activities performed during his last shift, including the activities of the Lieutenants, and the Sergeants.

**Deputy Chief Shomo Expressed Discrimination Against Plaintiff 's Military Service**

172. At the time that Deputy Chief Shomo was ordering Plaintiff to write more duplicative and needless reports, Plaintiff advised Deputy Chief Shomo that, in addition to having worked the night prior, sending out all command text notifications that came in when Plaintiff returned home, preparing all necessary reports and being on the mandatory phone conference, and coming in for the meeting with relatively no sleep on his scheduled day off, Plaintiff needed to prepare for his scheduled three (3) week Army training that was coming up in 48 hours.

173. Deputy Chief Shomo stated that "*__the Police Department obligations are priority__*.", and that the Information Reports were due at 3:30 P.M. the same day.

174. Plaintiff completed and submitted the Information Reports he was ordered to prepare to Deputy Chief Shomo shortly after 3:30 P.M. the same day on July 8, 2022.

175. As a result of Deputy Chief Shomo's discriminatory harassment, Plaintiff worked approximately 14.5 hours on his shift when the homicide occurred, had an approximate four-hour break to get home, eat and get some sleep and then was made to work another 7 hours because of being called in to work on his day-off for the meetings and then was ordered to complete the duplicative reports which totaled approximately 21 hours with basically no sleep.

**Disparate Treatment and Discrimination of Plaintiff and Continued Harassment**

176. Shortly afterwards, Plaintiff sent Deputy Chief Shomo an e-mail advising him that Plaintiff would be on military Orders with the Army from July 10, 2022, to July 30, 2022, and that Plaintiff would not be able to continue with his current duties at the Police Department during that time, as he would be needed in a fully capacity with the Army.

177. Based upon information and belief, three (3) additional homicides occurred while Plaintiff was out on Army orders from July 10 to July 30, 2022, and no other Captain has been called-out or harassed at a meeting, or accused of dropping the ball, and no other Captain was asked to explain in an "information report" why a particular homicide occurred on their shift (compared to Plaintiff who was seemingly blamed for a homicide happening on his own shift).

**Defendants Contacting Plaintiff About Work Matters While He was Serving Military Orders.**

178. On July 12, 2022, while Plaintiff was on Military Orders with the Army, Plaintiff received a text message from Deputy Chief Shomo asking "*why four officers were off for the day.*"

179. Plaintiff looked into the matter and saw that all four (4) officers had obtained approval in February to take the July 12, 2022, day off for vacations.

180. Deputy Chief Shomo then told Plaintiff that he wanted to see "proof" from the officers that they already paid for their vacations; again, Plaintiff was serving Military Orders at the time.

**Discriminatory and Retaliatory Transfer of Plaintiff**

181. Later in the day on July 12, 2022, Plaintiff received a transfer order in his Camden Metro Police Department email inbox.

182. The transfer order transferred Plaintiff into Human Resources (HR) Department for the time period: July 12, 2022,  to July 30, 2022, which reduced Plaintiff's overall pay by four hours per shift, during that time.

183. Ordinarily, a similar transfer would occur when someone is out of work for more than 30 days; However, Plaintiff was only out of work on Military Orders for twenty days, from July 10, 2022,  to July 30, 2022.

184. The transfer was another form of discrimination against Plaintiff for serving in the military.

**Disparate Treatment of Plaintiff with Regard to Time-Off for Sergeants Issue.**

185. On July 15, 2022, (while still serving on military Orders) Plaintiff received multiple text messages from Deputy Chief Shomo regarding Sergeants and scheduled time-off.

186. The text messages sent to Plaintiff by Deputy Chief Shomo concerned a prior conversation between Deputy Chief Shomo and Plaintiff which occurred on July 8, 2022, during which Deputy Chief Shomo had advised Plaintiff that the "new" sergeants would be riding along during their shifts, and if there was a "need" then a "senior" sergeant could assist the "new" sergeants.

187. Concerning this issue, Deputy Chief Shomo texted Plaintiff about a specific shift where it was covered by all "new" sergeants, and no "senior" sergeants were scheduled.

188. Because of this, Deputy Chief Shomo contrived an admonishment of Plaintiff by telling Plaintiff that he "*failed to identify short falls with the sergeant off time.*"

189. As a comparison, the opposite squad had the same situation occur on their shift, and the Captain on that shift was never reprimanded or even questioned about the situation.

190. Additionally, through July 31, 2022, Plaintiff was the only person in Command Staff who was not listed on the Metro Police Department website, notwithstanding that Command Staff personnel who were promoted after Plaintiff were listed on the website including but not limited to Lt. Manthey, Lt. Henderson, Lt. Aceto, Lt. Collins, Lt. Ross, Lt. Galloza, Lt. Reese.

191. On or about August 3, 2022, Plaintiff then went out on what was ultimately approved as F.M.L.A. leave.

## **FIRST COUNT**

### **38 U.S.C. §4301-4335 UNIFORMED SERVICE EMPLOYMENT & REEMPLOYMENT RIGHTS ACT OF 1994 ("USERRA")**

192. Plaintiff incorporates and re-alleges by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

193. The Uniformed Service Employment and Reemployment Rights Act of 1994, 38 U.S.C. §4301-4335, (U.S.E.R.R.A.) forbids an employer from discriminating against an employee with regard to hiring, retention, promotion or any benefit of employment because of an employee's application for or membership in any uniformed service. 38 U.S.C. §4311(a).

194. The New Jersey Army National Guard is one of the enumerated "uniformed services" listed at 38 U.S.C. §4303(16). As stated above, at all times relevant hereto, Plaintiff was a member of said uniformed service.

195. Any of Plaintiff's absence from work during deployment and military orders has solely been attributable to his performance of "service in the uniformed services" as that phrase is defined at 38 U.S.C. §4303 (13).

196. Plaintiff made proper notification about his mandatory military service dates to his employers pursuant to 38 U.S.C. § 4312 (e)(A)(i), (ii).

197. At all times relevant hereto, Plaintiff was qualified to perform the duties of his various positions and ranks at Camden County Metro Police Department pursuant to 38 U.S.C. § 4303.

198. At all times relevant hereto, Plaintiff was qualified for promotion to the rank of Sergeant, Lieutenant, and Captain, respectively within the Camden County Metro Police Department.

199. Defendants discriminated against Plaintiff based upon his military status by taking numerous adverse actions against him and by creating a hostile working environment through numerous discriminatory acts, including, but not limited to the following acts:

   a) Defendants ostracized, excluded, criticized, harassed, and intimidated Plaintiff due to his membership in the United States military.

   b) Defendants repeatedly and routinely treated Plaintiff disparately as set forth above.

   c) Defendants delayed Plaintiff's promotion.

   d) Defendants attempted to prevent Plaintiff's promotion.

   e) Defendants instituted baseless and pretextual internal affairs investigations against plaintiff.

   f) Defendants conducted 'fishing expedition' investigations of Plaintiff.

   g) Defendants baselessly and pretextually instituted discipline against Plaintiff.

h) Defendants have intentionally harassed and abused Plaintiff by treating him extremely poorly, by ordering him to come to work on his vacation time or day off, by ordering Plaintiff to work an impossible schedule that prevents Plaintiff from being able to obtain sleep, by ordering Plaintiff to write duplicative and needless reports just to spite him, by excluding Plaintiff from meetings, and by conspiring to prevent Plaintiff from being promoted.

i) Defendants have also harassed Plaintiff by contacting Plaintiff about Camden Metro Police Department Business and demanding answers, while Plaintiff was out serving on Military Orders.

j) Defendants failed or refused to take remedial action when other employees ostracized, harassed, or humiliated Plaintiff for his membership in the United States military.

k) Plaintiff has been repeatedly taunted and harassed concerning his military enrollment.

l) Defendants discriminated against Plaintiff as detailed above in this complaint.

200. In spite of plaintiff's complaints to supervisors, human resource officers, and agents of Defendant, no prompt or remedial action was taken to appropriately remedy Plaintiff's complaints of repeated discrimination.

201. To the extent any policy against discrimination existed, it was ignored.

202. To the extent any remedial plan was discussed, it was ignored or continually not

properly implemented.

203. Because of Defendants' actions, Plaintiff suffered stress, and humiliation.

204. Because of Defendants' actions, Plaintiff also suffered damages including but not limited to improper transfer, loss of pay associated with improper transfer, delay in promotion and loss of pay associated with same, disparate treatment, assignment of the oldest vehicle in the fleet, denial of vacation time or leave, pretextual discipline, exclusion, sleep deprivation, exhaustion, humiliation, pain and suffering and mental anguish from constant and repeated harassment and a hostile work environment, and attorney's fees.

205. Because of Defendants' discrimination, and retaliation, Plaintiff has suffered damages and is entitled to the rights and remedies set forth in the Uniformed Service Employment and Reemployment Rights Act of 1994, 38 U.S.C. §4301-4335.

206. Defendants' actions in failure to comply with U.S.E.R.R.A. was willful and thus defendants are liable for liquidated damages pursuant to 38 U.S.C. §4323(d).

207. The actions of the Defendants were outrageous and demonstrate a pattern and practice by the defendants of interference in plaintiff's rights.

208. The willful indifference of the Defendants creates liability against the defendants for punitive damages

209. Defendants' actions justify the imposition of punitive damages.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and against the Defendants for injunctive relief for defendants to cease all

harassment, discrimination and retaliation  against him, and Plaintiff seeks specific performance including assignment to a day-shift, assignment of a new departmental vehicle,  proper transition to the Captain's role in line with the other Captains, correction of the untenable schedule that has prevented Plaintiff from having a sufficient break between shift to obtain sleep,  recission of the pretextual discipline that had been imposed as discussed above, mandatory remedial classes for defendants to train them not to discriminate against employees, and three months retroactive pay for the delay in promotion to the Rank of Lieutenant from March of 2020 to June of 2020, inclusive of all appropriate seniority and back-pay.  Plaintiff also respectfully requests that the Court enter judgment in his favor against the Defendants for statutory damages under the Uniformed Service Employment and Reemployment Rights Act of 1994, 38 U.S.C. §4301-4335, compensatory damages, including damages for pain and suffering, emotional distress, medical expenses, loss of reputation, personal injury, back pay, front pay, consequential damages, liquidated damages, punitive damages, pre and post-judgment interest, costs, expert fees, reasonable attorney's fees enhanced pursuant to any applicable law, the cost of the suit, and such further relief as may be just and proper.

## SECOND COUNT
## RETALIAITON IN VIOLAITION OF U.S.E.R.R.A.

210. Plaintiff incorporates and re-alleges by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

211. The U.S.E.R.R.A. prohibits an employer from retaliating against an employee who asserts their rights under the Act.

212.   Defendants retaliated against Plaintiff for having complained that his rights under U.S.E.R.R.A. had been violated.

213.   Defendants retaliated against Plaintiff, as described above, including but not limited to:

a)   By failing to promote Plaintiff to the rank of Captain in accordance with the rules ascribed by the New Jersey Civil Service Commission, and treating Plaintiff different than his comparators because of his military status.

b)   By delaying Plaintiff's promotion to the rank of Lieutenant in accordance with the rules ascribed by the New Jersey Civil Service Commission, and treating Plaintiff different than his comparators because of his military status;

c)   By transferring Plaintiff the 6:00 PM to 6:00 AM shift immediately after Plaintiff informed Police Administration that he received orders to Full-time National Guard Duty as the State Marksman Coordinator, and despite being the most senior Lieutenant in the RTOIC. All of Plaintiff's comparators received the preferred day shift, and none of his comparators are members of the United States Military.

d)   By ostracizing, harassing, and humiliating Plaintiff and/or by refusing to take remedial action when other employees ostracized, harassed or humiliated Plaintiff;

e)   By delaying Plaintiff's promotion to the rank of Lieutenant for three (3)

months, from <u>March of 2020</u> to <u>June 1, 2020</u>

    f)   By failing to grant vacation or sick leave upon Plaintiff's requests and or by rescinding prior-approved leave; On <u>May 9, 2021</u>, <u>February 9, 2022</u>, <u>March 1, 2022</u>, <u>May 25, 2022</u>, <u>May 26, 2022</u>, <u>June 5, 2022</u>, <u>June 8, 2022</u>, <u>June 22, 2022</u>, <u>June 29, 2022</u>, <u>July 8, 2022</u>, and <u>July 12, through July 30, 2022</u>, 31 days.

    g)   By repeatedly contacted Plaintiff while he was away or Military Orders, during <u>February of 2019</u>, on <u>July 12, 2022</u>, and <u>July 15, 2022</u>.

h)   By taking the actions described in detail within this <u>Complaint, above</u>;

214.   As a result of defendant's conduct, plaintiff was damaged.  Defendant's conduct was beyond all bounds of decency and thus, punitive damages are appropriate.

215.   Because of Defendants' actions, Plaintiff suffered loss of respect, stress, and humiliation.

216.   Because of Defendants' actions, Plaintiff also suffered damages including but not limited to improper transfer, loss of pay associated with improper transfer, delay in promotion and loss of pay associated with same, disparate treatment, assignment of the oldest vehicle in the fleet, loss of vacation time or leave time, pretextual discipline, exclusion, sleep deprivation, exhaustion, humiliation, pain and suffering and mental anguish from constant and repeated harassment and a hostile work environment, and attorney's fees.

217.   The actions of the Defendants were outrageous and demonstrate a pattern and practice by the defendants of interference in plaintiff's rights.

218.    The actions of Defendants were willful and thus defendants are liable for liquidated damages pursuant to 38 U.S.C. §4323(d).

219.    The willful indifference of the Defendant creates liability against the defendants for punitive damages.

220.    The Defendants' acts of retaliation were performed with malicious and reckless indifference to plaintiffs' protected rights.

221.    Defendants' actions justify the imposition of punitive damages.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and against the Defendants for injunctive relief for defendants to cease all harassment, discrimination and retaliation  against him, and Plaintiff seeks specific performance including assignment to a day-shift, assignment of a new departmental vehicle,   proper transition to the Captain's role in line with the other Captains, correction of the untenable schedule that has prevented Plaintiff from having a sufficient break between shift to obtain sleep,  recission of the pretextual discipline that had been imposed as discussed above, mandatory remedial classes for defendants to train them not to discriminate against employees, and three months retroactive pay for the delay in promotion to the Rank of Lieutenant from March of 2020 to June of 2020, inclusive of all appropriate seniority and back-pay.  Plaintiff also respectfully requests that the Court enter judgment in his favor against the Defendants for  statutory damages under the Uniformed Service Employment and Reemployment Rights Act of 1994, 38 U.S.C. §4301-4335, compensatory damages, including damages for pain and suffering, emotional distress, medical expenses, loss of reputation, personal injury, back pay, front pay,

consequential damages, liquidated damages, punitive damages, pre and post-judgment interest, costs, expert fees, reasonable attorney's fees enhanced pursuant to any applicable law, the cost of the suit, and such further relief as may be just and proper.

## THIRD COUNT
## NEW JERSY LAW AGAINST DISCRIMINATON

222. Plaintiff incorporates and re-alleges by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

223. The New Jersey Law Against Discrimination (LAD) prohibits an employer from discriminating against an employee on the basis of a person's membership in the Armed Forces.

224. Certain conduct included in the _Factual Background_, above, and complained of by the Plaintiff would not have occurred but for the fact that the Plaintiff was a member of a protected class, and/or spoke against the discrimination regarding his military status.

225. Defendants discriminated against Plaintiff as provided in detail, above.

226. The conduct complained of by the Plaintiff was severe and pervasive enough to make a reasonable person believe that the terms and conditions of his employment were altered and that the working environment was hostile and abusive.

227. Plaintiff was harassed by the Defendants, and discriminated against by Defendants as provided in detail above.

228. Because of Defendants' actions, Plaintiff suffered sleep deprivation, stress and humiliation.

229. Because of Defendants' actions, Plaintiff also suffered damages including but not limited to improper transfer, loss of pay associated with improper transfer, delay in promotion and loss of pay associated with same, disparate treatment, assignment of the oldest vehicle in the fleet, loss of vacation time or leave time, pretextual discipline, exclusion, sleep deprivation, exhaustion, humiliation, pain and suffering and mental anguish from constant and repeated harassment and a hostile work environment, and attorney's fees

230. In spite of Plaintiff's complaints, no prompt or remedial action was taken to appropriately remedy Plaintiff's complaints of discrimination.

231. To the extent any policy against discrimination existed it was ignored.

232. To the extent any remedial plan was discussed, it was ignored or continually not properly implemented.

233. The alleged actions were outrageous and beyond all bounds of human decency justifying the imposition of punitive damages.

234. The Defendants' actions were performed with reckless indifference to the Plaintiff's protected activity.

235. The Plaintiff, as a direct and proximate result of the Defendants' actions, suffered damages including, but not limited to the damages discussed above in this complaint, and delay in promotion and loss of pay associated with same, harassment, exclusion, disparate treatment, denial of days off or vacation time, sleep deprivation, hostile working environment, pretextual discipline, loss of respect, pain and suffering, emotional distress with physical manifestation of that distress,

embarrassment, and humiliation, and attorneys' fees.

236. Defendants, by the foregoing actions, have discriminated against the Plaintiff, caused Plaintiff damage, and denied Plaintiff opportunities for employment in violation of N.J.S.A. 34:19-1 et. seq. (NJLAD).

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and against the Defendants for specific performance including for injunctive relief against defendants to cease all harassment, discrimination and retaliation  against him, and Plaintiff seeks specific performance including assignment to a day-shift, assignment of a new departmental vehicle,   proper transition to the Captain's role in line with the other Captains, correction of the untenable schedule that has prevented Plaintiff from having a sufficient break between shift to obtain sleep,  recission of the pretextual discipline that had been imposed as discussed above, mandatory remedial classes for defendants to train them not to discriminate against employees, and three months retroactive pay for the delay in promotion to the Rank of Lieutenant from March of 2020 to June of 2020, inclusive of all appropriate seniority and back-pay.   In addition, Plaintiff respectfully request the Court enter judgement against the Defendants for statutory damages under the LAD, compensatory damages, including damages for pain and suffering, emotional distress, medical expenses, loss of reputation, personal injury, back pay, front pay, consequential damages, liquidated damages, punitive damages, pre and post-judgment interest, costs, reasonable attorney's fees, enhanced under the LAD, the cost of the suit, and such further relief as may be just and proper.

## FOURTH COUNT
## RETALIATION IN VIOLATION OF LAD

237.   Plaintiff incorporates and re-alleges by reference the foregoing paragraphs of this Complaint as if fully set forth herein.

238.   The LAD prohibits an employer from retaliating against an employee who asserts their rights under the Act.

239.   Defendants retaliated against Plaintiff for having complained that his rights under the LAD had been violated.

240.   Defendants retaliated against Plaintiff, as described above, including but not limited to by taking the actions described in detail within this complaint;

241.   As a result of Defendants' conduct, plaintiff was damaged.  Defendants' conduct was beyond all bounds of decency and thus, punitive damages are appropriate.

242.   The Plaintiff, as a direct and proximate result of the Defendants' actions, suffered damages including, but not limited to the damages discussed above in this complaint, and delay in promotion and loss of pay associated with same, harassment, exclusion, disparate treatment, denial of days off or vacation time, sleep deprivation, hostile working environment, pretextual discipline, loss of respect, pain and suffering,  emotional distress with physical manifestation of that distress, embarrassment, and humiliation, and attorneys' fees.

243.   The actions of the Defendants were outrageous and demonstrate a pattern and practice by the Defendants of interference in Plaintiff's rights.

244.   The willful indifference of the Defendants creates liability against the Defendants

for punitive damages.

245.   The Defendants' acts of retaliation were performed with malicious and reckless indifference to Plaintiffs' protected rights.

246.   Defendants' actions justify the imposition of punitive damages.

**WHEREFORE**, Plaintiff respectfully requests that the Court enter judgment in his favor and against the Defendants for specific performance including for injunctive relief against defendants to cease all harassment, discrimination and retaliation  against him, and Plaintiff seeks specific performance including assignment to a day-shift, assignment of a new departmental vehicle,   proper transition to the Captain's role in line with the other Captains, correction of the untenable schedule that has prevented Plaintiff from having a sufficient break between shift to obtain sleep,  recission of the pretextual discipline that had been imposed as discussed above, mandatory remedial classes for defendants to train them not to discriminate against employees, and three months retroactive pay for the delay in promotion to the Rank of Lieutenant from March of 2020 to June of 2020, inclusive of all appropriate seniority and back-pay.   In addition, Plaintiff respectfully request the Court enter judgement against the Defendants for statutory damages under the LAD, compensatory damages, including damages for pain and suffering, emotional distress, medical expenses, loss of reputation, personal injury, back pay, front pay, consequential damages, liquidated damages, punitive damages, pre and post-judgment interest, costs, reasonable attorney's fees, enhanced under the LAD, the cost of the suit, and such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Please take notice that Plaintiffs hereby demand a trial by jury as to all issues in the above matter.

## DESIGNATION OF TRIAL COUNSEL

Michael C. Mormando, Esquire, of Attorneys Hartman, Chartered, is hereby designated as trial counsel in the within matter.

## CERTIFICATION PURSUANT TO R. 4:5-1

The undersigned hereby certifies that to the best of his knowledge, the matter in controversy is not the subject of any other pending action or arbitration, and that he is not aware of any other parties who should be joined in this action at this time.

ATTORNEYS HARTMAN, CHARTERED

Dated:  10/31/2022            By: /S/ *Michael C. Mormando*
                                 MICHAEL C. MORMANDO, ESQ.
                                 (NJ Atty ID: 030352001)
                                 68 E. Main Street
                                 Moorestown, NJ 08057
                                 856-235-0220; f 856-273-8617
                                 mcmesq@attorneyshartman.com